[No. A088568. First Dist., Div. Three. Jan. 17, 2001.]

LOUIS A. GORDON, Plaintiff and Appellant, v.
DON HORSLEY, as Sheriff, etc., et al., Defendants and Respondents.

## COUNSEL

Clisham & Sortor, David P. Clisham and William H. Sortor for Plaintiff and Appellant.

Thomas F. Casey III, County Counsel, and Carol L. Woodward, Deputy County Counsel, for Defendants and Respondents.

Mayer & Coble, Martin J. Mayer and Cynthia W. Blaylock for California State Sheriff's Association et al. as Amici Curiae on behalf of Defendants and Respondents.

Lloyd W. Pellman, County Counsel (Los Angeles) and Gordon W. Trask, Principal Deputy County Counsel, for California Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**PARRILLI, J.**—Does a sheriff have authority to administratively restrict a deputy's peace officer powers to arrest and to carry a concealed firearm off

duty, when the deputy has shown he may present a danger to the public if he is allowed to exercise those powers? We conclude a sheriff does have such authority.

However, we also conclude that a deputy has a right to administratively appeal such restrictions on his peace officer powers. Since the deputy in this case was denied that right, we reverse and remand with directions.

I

### INTRODUCTION AND BACKGROUND

Appellant Louis A. Gordon is a San Mateo County deputy sheriff and consequently a "peace officer" pursuant to Penal Code section 830.1.[1] Deputy Gordon's status as a peace officer confers on him two benefits that accompany him throughout this state, even when he is off duty. First, he is exempt from the provisions of the penal statute that outlaw possession of a concealed firearm.[2] Second, as a peace officer, he has legal authority to make an arrest under circumstances where a private citizen could not lawfully do so.[3]

Deputy Gordon contends these statutorily conferred benefits trump the sheriff's inherent power to control the conduct of his employees. He contends the sheriff *cannot* restrict a deputy's off-duty legal authority to arrest, and *cannot* prohibit a deputy from carrying a concealed firearm off duty. As we explain, a sheriff can restrict those powers, and properly did so here.

A. *The Incident Leading to Discipline.*

In August of 1994, Deputy Gordon was off duty driving on Interstate Highway 280 in his 1978 Ferrari sports car when a light truck/utility vehicle cut him off. Gordon, who was with his girlfriend, followed the truck off the freeway and onto suburban surface streets. At a stoplight, Deputy Gordon displayed his badge to the driver of the truck and ordered him to stop. However, the driver, Anselmo Pring, did not stop. Also in the truck with Pring were his wife, his teenage daughter, and his niece.

---

[1]Penal Code section 830.1 provides in pertinent part: "Any sheriff, undersheriff, or deputy sheriff, employed in that capacity, of a county . . . is a peace officer."

[2]Penal Code section 12025 generally provides that person is "guilty of carrying a concealed firearm" when he carries a concealed firearm in his vehicle or on his person. Penal Code section 12027 states that "[s]ection 12025 does not apply to, or affect . . . [¶] [a]ny peace officer, listed in Section 830.1 . . . whether active or honorably retired . . . ." (Pen. Code, § 12027, subd. (a)(1)(A).)

[3]Compare Penal Code sections 836 (peace officer's authority to arrest) and 837 (arrest by private person).

Deputy Gordon continued to follow Pring to Sonja Court, a dead-end street. Although the testimony regarding the seriousness of Deputy Gordon's conduct is in conflict, it is undisputed that Deputy Gordon pulled his service weapon, pointed it at Pring, and told him to turn off his engine.

The arbitrator who heard Deputy Gordon's grievance tended to discount the most damning evidence against Gordon.[4] Nevertheless, even the arbitrator concluded Deputy Gordon had violated section · 33 of the sheriff's General Order 7-1, which states that "Off-duty members of [the] department will refrain from making misdemeanor traffic arrests. Pursuit of another vehicle in the off-duty officer's automobile is unlawful and dangerous."

Moreover, Deputy Gordon contended he was pursuing Pring for a felony assault with a deadly weapon. The arbitrator found Gordon's testimony on this point "insupportable." "Pring's account of what occurred on the freeway is even more bizarre than [Deputy Gordon's], and it is quite likely that he in fact cut [Deputy Gordon] off in a dangerous manner. Nevertheless, Pring was driving with his wife, his daughter, and his niece, and it is absurd that without provocation he would have maliciously intended to force a complete stranger off the road. Because of his own personal involvement, [Deputy Gordon] grossly overreacted to Pring's unsafe driving by following him, attempting to pull him over, and eventually causing a confrontation on Sonja Court." The arbitrator concluded Gordon used "terrible judgment" in the encounter.

## B. *Disciplinary Proceedings.*

Initially, the sheriff suspended Deputy Gordon for two days without pay, effective January 25, 1995, based on the Pring incident. Deputy Gordon filed a grievance of this discipline but, before that grievance could be heard, the sheriff learned new facts about the Pring incident that caused him to conclude the two-day suspension was inadequate. Consequently, on December 5, 1995, the sheriff rescinded the two-day suspension and instead

---

[4]For example, a school principal who had just moved onto Sonja Court witnessed the confrontation and wrote a letter in which she stated Deputy Gordon "was not acting like a police officer and I wouldn't have done what he was demanding either! He was using all manner of foul and profane language, shouting at the top of his lungs and pointing a weapon at an unarmed man with other people, including children, in the vehicle. In short, he was acting like someone high on drugs." Although the arbitrator noted that the sheriff took the witness's letter at face value, the arbitrator concluded that "various aspects of her testimony were unconvincing."

demoted Deputy Gordon to the lower rank of correctional officer.[5] After a *Skelly* hearing (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774]), the demotion became final on January 11, 1996.

Deputy Gordon asked for binding arbitration of his demotion pursuant to the memorandum of understanding between his union and the county. The issue before the arbitrator was whether Gordon's demotion was "for just cause."

The arbitrator found the demotion was improper on procedural grounds. The arbitrator observed that the issue before him involved "what is commonly referred to as industrial due process. . . . [I]t has been held that just cause requires an employer to administer discipline in a manner that provides employees with basic procedural fairness . . . . [I]f under the circumstances discipline is imposed in a manner which is prejudicial to an employee's ability to defend himself or herself or which offends fundamental concepts of fairness, the discipline lacks just cause.

"In this case, the underlying incident was immediately the subject of an internal affairs investigation, resulting in the imposition of a two-day suspension. . . . The decision ten months later to rescind the suspension and impose more severe discipline was an extraordinary delay which raised serious issues of fairness."

The sheriff attempted to justify his tardy decision to demote Deputy Gordon by claiming he had relied on newly discovered evidence. Among other things, the sheriff relied on a letter he had received from a third party witness (see fn. 4, *ante*) who described Deputy Gordon as using profanity, shouting at the top of his lungs, and "acting like someone high on drugs" when he stopped Pring.

The arbitrator concluded that this new evidence did not justify the decision to demote Deputy Gordon 10 months after he had been suspended. The arbitrator reasoned: "The Department's decision to rescind the two-day suspension ten months after it was imposed and to demote [Deputy Gordon] to correctional officer represented procedural unfairness which, unless justified on the basis of newly-discovered evidence, established a lack of just cause for the demotion. . . . [T]he claimed newly-discovered evidence was either known at the time of the original suspension, or it was not an adequate basis for increasing the discipline."

---

[5]Initially, the sheriff informed Gordon he was being rejected during his probationary period as a deputy sheriff, but, after the sheriff learned Gordon had already completed his probationary period, the sheriff changed his decision to one of demotion for cause.

The arbitrator did conclude, however, that the two-day suspension was appropriate.

The arbitrator ordered the sheriff to immediately reinstate Gordon as a deputy sheriff, and awarded him backpay.

The sheriff complied with this order. However, in a letter dated September 24, 1996, the sheriff informed Deputy Gordon that he would continue to be assigned to the correctional facility where he was already working. In addition, the sheriff stated: "Although you are reinstated with full pay and benefits of a Deputy Sheriff, I have grave concerns that you have demonstrated poor judgment and decision making ability both on and off duty. Therefore, you will not be issued a duty firearm. In addition, you are prohibited from carrying a concealed firearm and from exercising peace officer powers during your off duty hours."[6]

After the San Mateo County Civil Service Commission refused to hear Gordon's appeal of these restrictions, he filed a civil action for a writ of mandate (Code Civ. Proc., § 1085) and other causes of action to (1) force the sheriff to issue him a firearm and to authorize his use of full peace officer powers; and (2) to order the county civil service commission to hold a hearing on Gordon's appeal of the restrictions. After a hearing, the court denied the writ of mandate on the merits. The court subsequently granted the sheriff's motion for judgment on the pleadings as to the remaining causes of action on the ground the key issue had been decided in the mandate action, and thus the other causes of action were barred by res judicata and collateral estoppel. Gordon filed a timely notice of appeal from the ensuing judgment.

## II

## DISCUSSION

A. *The Sheriff Had Authority to Impose the Off-duty Restrictions.*

■ As indicated, the primary issue in this case is whether the sheriff has authority to administratively restrict a deputy's peace officer powers to arrest and to carry a concealed firearm off duty, when the deputy has shown he may present a danger to the public if he is allowed to exercise those powers. We conclude the sheriff does have that authority.

---

[6]These restrictions were initially to be in place for only one year, until Gordon completed a performance improvement plan, and the sheriff removed the restrictions. However, Gordon refused to participate in the "ride along" portion of the improvement plan, and the sheriff did not remove the restrictions.

Reduced to its essence, Gordon's argument is that his *status* as a peace officer confers on him the right to exercise peace officer arrest authority and to carry a concealed firearm off duty. Moreover, Gordon contends the sheriff has no authority to restrict those rights, short of demoting him to a non-peace-officer classification.

As we have noted, Deputy Gordon's status as a peace officer confers on him two benefits that accompany him throughout this state, even when he is off duty. First, he is exempt from the provisions of the penal statute that outlaws possession of a concealed firearm. (Pen. Code, § 12027, subd. (a)(1)(A).) Second, as a peace officer, he has statutory authority to make an arrest under circumstances where a private citizen could not lawfully do so. (Cf. Pen. Code, §§ 836 & 837.) Thus, it may be that the sheriff's restrictions cannot make it a criminal act for Deputy Gordon to carry a concealed firearm, and cannot affect the lawfulness of his off-duty arrest of a third party. But those issues are not before us.[7]

Instead, the issue before us is whether the sheriff has the inherent authority to administratively supervise and restrict Deputy Gordon's off-duty peace officer privileges, provided there is good cause for doing so. We conclude he does have that power.

The Second Appellate District, Division Four, considered a similar issue in *Stuessel v. City of Glendale* (1983) 141 Cal.App.3d 1047 [190 Cal.Rptr. 773] (*Stuessel*). There, the Glendale Police Department ordered one of its officers, who was in extremely poor physical condition, not to carry a firearm, prohibited him from making arrests, and assigned him to a desk job. The officer sought a disability retirement, citing these restrictions, but the city refused to grant the retirement. (*Id.* at pp. 1049-1050.)

In upholding the city's decision, the Court of Appeal held that a peace officer employee who retains his classification as a peace officer, maintains the same salary and benefits, and has the same promotional opportunities as other officers, may nevertheless be placed in an assignment where he does not have a right to carry a firearm or make arrests. (*Stuessel, supra,* 141 Cal.App.3d at p. 1051.)

The *Stuessel* court specifically rejected the officer's claim that he had a vested right as a peace officer to carry a firearm and to exercise his peace officer power to arrest. (*Stuessel, supra,* 141 Cal.App.3d at p. 1053.) The

---

[7]As we have indicated, we do not consider in this case whether administrative restrictions can remove a peace officer's exemption from the law prohibiting the carrying of concealed firearms, or can affect the validity of an arrest. Thus, we express no opinion on these issues.

court held that "a police officer, as a peace officer, has no fundamental or vested right to carry a firearm or exercise the power to make arrests where, as here, there is a proper medical reason involving his own safety and that of the public for removing those rights." (*Id.* at p. 1054.) The court subsequently emphasized that "We expressly conclude that the right to carry a firearm, whether concealed or not, is not a fundamental or vested right of a police officer incapacitated from doing so without danger to that officer or the public." (*Ibid.*)

Thus, it is clear a police department may restrict a peace officer's privilege to carry a concealed firearm and to exercise peace officer arrest powers because of concerns about the officer's physical health. Logically, a sheriff may also restrict a deputy's privilege to carry a concealed firearm and to exercise broader arrest powers because of concerns about the deputy's psychological or emotional health.

Here, the sheriff could reasonably conclude that Deputy Gordon's "gross[] overreact[ion]" and "terrible judgment" in the Pring incident indicated he would present a danger to himself and the public if he were to carry a concealed firearm, or exercise the broader arrest powers accorded a peace officer, whether on or off duty.

As amicus curiae California Association of Counties notes: "It is the fact of an officer's incompetence, and not its cause, that makes it necessary to restrict the . . . officer's powers. No meaningful distinction can be made between restricting an officer whose physical impairment renders him incompetent to carry firearms or make arrests and restricting an officer whose impaired judgment renders him incompetent. If an officer is incompetent to perform these functions for any reason, public safety requires that the officer be disarmed and restricted in the performance of duty until a satisfactory degree of competence is obtained." We agree.

We also conclude that, in these circumstances, the sheriff has the inherent authority to control Deputy Gordon's off-duty use of a concealed weapon and exercise of peace officer powers. As Division Three of the Second Appellate District noted in a case involving facts similar to those before us, "The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability." (*Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1223 [40 Cal.Rptr.2d 583].) Although *Hankla* involved a decision to terminate (rather than restrict the powers of) a police officer who became engaged in an off-duty traffic dispute, the court's language is nevertheless apt: "In light of the infantile behavior of [the officer] in

engaging in an unjustified traffic dispute, his conduct in escalating rather than defusing the argument, and his patently reckless behavior in handling a deadly weapon, it is entirely understandable why the Long Beach Police Department decided that it did not want an individual with so little emotional self-control or good judgment risking the lives of the citizenry . . . ." (*Id.* at p. 1226.) Similarly, here it is entirely understandable why the Sheriff of San Mateo County did not want an individual lacking emotional self-control and good judgment risking the lives of the citizenry by carrying a concealed firearm and exercising peace officer arrest powers off duty.

Deputy Gordon relies heavily on *Orange County Employees Assn., Inc. v. County of Orange* (1993) 14 Cal.App.4th 575 [17 Cal.Rptr.2d 695] (*Orange County*). In that case, Orange County issued a blanket order prohibiting certain classes of employees (airport law enforcement officers, deputy coroners, and court officers) who were statutory peace officers from carrying concealed firearms off duty. The issue in the case was not whether Orange County had the authority to prohibit the specified officers from carrying concealed weapons on duty, which it clearly did, but whether that authority extended to prohibit the employees from carrying concealed firearms off duty. (*Id.* at pp. 577-578.)

In resolving the issue against Orange County, the court focused on the language of the statutes that created the peace officer classifications at issue. Those statutes state that the peace officers established pursuant to those provisions " 'may carry firearms only if authorized and under terms and conditions specified by their employing agency.' " (*Orange County, supra*, 14 Cal.App.4th at p. 577.) The *Orange County* court relied on a series of Attorney General opinions that interpreted similar language. Those opinions held, in essence, that the statutory language permitted the employing agencies to prohibit the peace officers from carrying weapons while on duty, but " 'the Legislature did not intend to grant the employing agency any such control over the nonemployment related conduct of its . . . officers.' " (*Id.* at p. 580, quoting 65 Ops.Cal.Atty.Gen. 527, 533 (1982).)

The *Orange County* court noted that, in 1982, the Attorney General interpreted the language "may carry firearms only if authorized and under terms and conditions specified by their employing agency" as referring only to on-duty officers. The *Orange County* court further noted the Legislature had not taken steps to alter this construction, and had in fact subsequently enacted the identical language in similar statutes, indicating it approved of and agreed with this construction. (*Orange County, supra,* 14 Cal.App.4th at pp. 581-582.)

This case is distinguishable from *Orange County* for a number of reasons. First and foremost, *Orange County* involved a blanket order that prohibited

an entire class of peace officers from carrying concealed weapons off duty. It did not involve a determination that a specific officer should be prevented from carrying a concealed firearm off duty because his conduct presented a danger to the public. It is one thing to say an employing agency does not have authority to presumptively control the off-duty conduct of an entire class of peace officers. It is quite another to say an employing agency lacks authority to restrict the off-duty conduct of a specific peace officer when the employing agency has good cause to believe he lacks the necessary judgment to carry a concealed firearm on or off duty.

Second, *Orange County* and the Attorney General opinions it relied on involve the statutory interpretation of a phrase ("may carry firearms only if authorized and under terms and conditions specified by their employing agency") that is not at issue in this case. Penal Code section 830.1, subdivision (a)—which states that a deputy sheriff is a peace officer—does not contain similar language. Moreover, the Attorney General has already concluded that Penal Code section 12027, subdivision (a)(1)(A) does not confer a right on a peace officer to carry a concealed weapon. Rather, that section has "no function other than to exempt specified individuals from criminal prosecution." (83 Ops.Cal.Atty.Gen. 121, 122 (2000).)

Amicus curiae California Association of Counties asks that we disagree with *Orange County* and find that it is wrongly decided. Although amicus curiae presents some persuasive arguments on this point, we need not, and do not, expressly disagree with *Orange County*'s holding. We decline to do so because whether decided correctly or not, *Orange County* does not control this case. Instead, we believe the present case, which involves a specific prohibition against a specific officer based on good cause, falls within *Stuessel*'s holding that "a police officer, as a peace officer, has no fundamental or vested right to carry a firearm or exercise the power to make arrests where . . . there is a proper . . . reason involving his own safety and that of the public for removing those rights." (*Stuessel, supra,* 141 Cal.App.3d. at p. 1054.)

B. *Deputy Gordon Had a Right to Administratively Appeal the Sheriff's Written Reprimand and Restrictions.*

As indicated, after Deputy Gordon received written notice of the restrictions on his peace officer powers, he filed an appeal with the San Mateo Civil Service Commission (Commission) challenging those restrictions. The Commission refused to hold a hearing on the appeal, concluding that the restrictions were not punitive, and thus Gordon did not have an absolute right to appeal them. Moreover, the Commission refused to grant Gordon a discretionary appeal. ■ We conclude the actions the sheriff took were punitive and thus Deputy Gordon had an absolute right to appeal them.

The Public Safety Officers Procedural Bill of Rights Act grants all peace officers, including Deputy Gordon, various procedural protections in California, including the right to administratively appeal certain adverse actions. (Gov. Code, §§ 3300, 3301; *Burden v. Snowden* (1992) 2 Cal.4th 556, 561 [7 Cal.Rptr.2d 531, 828 P.2d 672].) In particular, Government Code section 3304, subdivision (b) provides that "No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency . . . without providing the public safety officer with an opportunity for administrative appeal." ▇ At minimum, section 3304 requires that a peace officer receive an evidentiary hearing before a neutral fact finder to challenge the punitive action. (*Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1329 [91 Cal.Rptr.2d 171].)

Punitive action is defined in Government Code section 3303 as "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." It is significant that, with the exception of transfer, the motivation behind the action need not be punitive for the action to constitute a punitive action within the meaning of the statute. Thus, dismissal, demotion, suspension, reduction in salary or written reprimand are considered per se punitive, without regard to the motivation for those actions. (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 682-683 [183 Cal.Rptr. 520, 646 P.2d 191]; *Baggett v. Gates* (1982) 32 Cal.3d 128, 141 [185 Cal.Rptr. 232, 649 P.2d 874]; *Swift v. County of Placer* (1984) 153 Cal.App.3d 209 [200 Cal.Rptr. 181].)

Here, the letter the sheriff wrote to Gordon was a written reprimand[8] that the sheriff placed in Gordon's personnel file. The letter stated: "As the Sheriff, it is my responsibility to manage and monitor the sworn officers in my department. In addition, it is my responsibility, as Sheriff, to protect the community from risks of which I have become aware. Although you are reinstated with full pay and benefits of a Deputy Sheriff, I have grave concerns that you have demonstrated poor judgment and decision making ability both on and off duty. Therefore, you will not be issued a duty firearm. In addition, you are prohibited from carrying a concealed firearm and from exercising peace officer powers during your off duty hours."[9] The sheriff's statement that he had "grave concerns that [Gordon had] demonstrated poor

---

[8]Webster's defines "reprimand" as "a severe or formal reproof," and defines "reproof" as "criticism for a fault." (Webster's New Collegiate Dict. (1977) pp. 982, 983.)

[9]The letter provided in full: "September 24, 1996 [¶] Deputy Louis Gordon [¶] Maguire Correctional Facility [¶] Dear Deputy Gordon: [¶] This letter is to advise you that you are hereby reinstated to the classification of Deputy Sheriff. You will continue to be assigned to the Maguire Correctional Facility. [¶] As the Sheriff, it is my responsibility to manage and monitor the sworn officers in my department. In addition, it is my responsibility, as Sheriff, to protect the community from risks of which I have become aware. Although you are

judgment and decision making ability both on and off duty" was unquestionably a criticism for a fault and thus constituted a written reprimand. (See fn. 9, *ante.*)

 But the letter went beyond criticizing Gordon; it specifically removed privileges that are accorded other peace officers. Although such restrictions are not listed as punitive actions in Government Code section 3303, we think it relevant the letter has been placed in Deputy Gordon's personnel file where it will almost certainly have an impact on his future opportunities for advancement in the sheriff's department.

In this respect, the present case is similar to *Hopson v. City of Los Angeles* (1983) 139 Cal.App.3d 347 [188 Cal.Rptr. 689] (*Hopson*). There, Los Angeles police officers shot and killed a citizen in an on-duty incident. The shooting review board concluded the shooting was "in policy" and the chief of police adopted the review board's conclusion. The board of police commissioners then independently investigated the matter and rendered a contrary report. The commissioners concluded the officers' actions violated department policy, and that the officers made "serious errors in judgment, and in their choice of tactics, which contributed to the fatal shooting." The officers at issue were not afforded an administrative appeal to challenge the report. (*Id.* at pp. 349-350.)

The issue before the *Hopson* court was whether the proposed entry of the commissioners' report into the personnel files of the affected officers was punitive so that the officers were entitled to an administrative appeal under Government Code section 3304, subdivision (b). (*Hopson, supra,* 139 Cal.App.3d at p. 350.) The court reasoned that even though the report did not directly lead to discipline against the officers, the negative impact the report would tend to have on the officers' careers rendered that report punitive in nature. Accordingly, the officers were entitled to an administrative appeal pursuant to section 3304. (139 Cal.App.3d at pp. 352-354.) In

---

reinstated with full pay and benefits of a Deputy Sheriff, I have grave concerns that you have demonstrated poor judgment and decision making ability both on and off duty. Therefore, you will not be issued a duty firearm. In addition, you are prohibited from carrying a concealed firearm and from exercising peace officer powers during your off duty hours. These restrictions will be in effect for a period of one year. During this time, you will be placed on a performance improvement plan which will include regular evaluations of your job performance, judgment and decision making ability. You will also be required to attend training classes as prescribed by the Training Manager. Also, during this period, you are exempt from the range qualification requirement. [¶] At the conclusion of the year, I will review your performance, evaluations and training and determine if you have improved your judgment and decision making ability to an acceptable level. When I am confident that you have improved your skills in the areas discussed, I will issue you a duty firearm. This letter will be placed in your personnel file. You have the right to respond to this letter within 30 days. [¶] Sincerely, [¶] Don Horsley, Sheriff."

reaching this conclusion, the *Hopson* court specifically relied on the Supreme Court's mandate in *White*, that the " 'opportunity to appeal a decision resulting in disadvantage, harm, loss or hardship' " should be " 'widely available.' " (*Id.* at p. 351; *White v. County of Sacramento, supra,* 31 Cal.3d at p. 683.) The *Hopson* court found that placing the commissioners' report into the officers' personnel files would "result in disadvantage, harm, loss or hardship." (139 Cal.App.3d at p. 354.)

The Fourth Appellate District, Division One, followed and expanded *Hopson* in *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209 [85 Cal.Rptr.2d 660]. There, a citizens law enforcement review board issued findings of serious misconduct against certain deputy sheriffs. Even though the board was separate and independent from the sheriff's department, and there was no evidence the reports would be placed in the deputies' personnel files, the court found the findings constituted punitive action. (*Id.* at pp. 1212-1213, 1220, 1222.) The court reasoned: "Whether formally placed in files, the evidence presented here establishes the reports will be considered in future personnel decisions affecting these deputies and may lead to punitive action. . . . [¶] Having concluded the [board's] reports may impact personnel decisions adversely, we determine the trial court erred in finding there was insufficient evidence of punitive action within the meaning of Government Code section 3303 and Deputies were not entitled to administrative appeals under Government Code section 3304, subdivision (b)." (72 Cal.App.4th at p. 1222.)

If anything, the argument for finding punitive action in this case is stronger than it was in *Hopson* and *Caloca*. Here, the sheriff himself— not a third party watchdog agency—issued the written reprimand. Moreover, unlike *Hopson* and *Caloca*, here the sheriff went beyond merely making findings; he specifically restricted Deputy Gordon's peace officer powers —powers that were accorded as a matter of course to other peace officers. In short, placing the letter in Deputy Gordon's personnel file, and enforcing the restrictions it outlined, resulted in "disadvantage, harm, loss or hardship" to Deputy Gordon. (*Hopson, supra,* 139 Cal.App.3d at p. 354.) ▬▬ ▬ ▬ In our view, this constituted punitive action and Deputy Gordon is entitled to an administrative appeal of those actions.[10]

▬ We are not persuaded the sheriff's letter is akin to a *routine* performance evaluation containing negative comments. This district has held

---

[10]We reject the sheriff's argument that Deputy Gordon waived his right to challenge the Commission's decision because he proceeded by way of traditional mandamus rather than administrative mandamus (Code Civ. Proc., § 1094.5). Many of the challenges to a public agency's denial of a right to appeal a punitive action under Government Code section 3304, subdivision (b) have been by way of traditional mandamus. (See, e.g., *Caloca v. County of San Diego, supra,* 72 Cal.App.4th at p. 1217; *Runyan v. Ellis* (1995) 40 Cal.App.4th 961, 963 [47

such comments do not, in and of themselves, amount to punitive action. This is because "the nature of an employee evaluation is such that negative comments may be expected. Certainly, the Legislature did not contemplate an administrative appeal every time an employee receives an adverse evaluation. Indeed, the Legislature has obviously drawn a distinction between 'punitive action' and adverse comments entered in a personnel file. As to the former, an administrative appeal is mandated (Gov. Code, § 3304, subd. (b)), but as to the latter, the officer merely has the right to notice and to respond (Gov. Code, §§ 3305, 3306)." (*Turturici v. City of Redwood City* (1987) 190 Cal.App.3d 1447, 1449-1450 [236 Cal.Rptr. 53].)

Although we agree with *Turturici*'s holding, this case does not involve a routine performance evaluation where negative comments may be expected. Instead, this case involves a written reprimand that relates to a specific instance of misconduct and that imposes specific restrictions on the peace officer's powers as a result of that misconduct. In our view, this amounts to punitive action within both the letter and the spirit of the Public Safety Officers Procedural Bill of Rights.

## C. *Deputy Gordon's Remaining Arguments.*

In addition to contending the sheriff had no power to restrict his off-duty conduct, Deputy Gordon also contends the trial court improperly "rel[ied] upon [the sheriff's] attempt to relitigate arguments and issues adjudicated in the final and binding arbitration" in denying the petition for writ of mandate. We are somewhat mystified by this argument. The issue in the mandate action before the trial court, and this court, was essentially one of law, not of fact. The issue was whether the sheriff had *the legal power* to restrict Deputy Gordon's off-duty conduct, not whether he abused his discretion in exercising that power. Indeed, traditional mandate (Code Civ. Proc., § 1085), which is at issue in this case, may only be issued to a public official or agency "to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded . . . ." (Code Civ. Proc., § 1085.) ■ Traditional mandamus will not lie to control the discretion of a public official or agency; that is, to

Cal.Rptr.2d 356].) Indeed, the very case the sheriff cites to support his argument that Gordon did not exhaust his administrative appeal rights, states that "The doctrine has absolutely no application in this case, as the *judicial* review of an agency determination [under Code of Civil Procedure section 1094.5] can in no way be considered part of the *administrative* process which must be exhausted before a subsequent judicial action may commence." (*Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 240 [244 Cal.Rptr. 764], italics in original.) Likewise, since Gordon *is* judicially challenging the Commission's decision through traditional mandamus, the doctrine of "judicial preclusion" does not apply either. (*Id.* at pp. 240-244.)

force the exercise of discretion in a particular manner. (*Miller Family Home, Inc. v. Department of Social Services* (1997) 57 Cal.App.4th 488, 491 [67 Cal.Rptr.2d 171].)

Although traditional mandate will lie to correct abuses of discretion, a party seeking review under traditional mandamus must show the public official or agency invested with discretion acted arbitrarily, capriciously, fraudulently, or without due regard for his rights, and that the action prejudiced him. *(Huntington Park Redevelopment Agency v. Duncan* (1983) 142 Cal.App.3d 17, 25 [190 Cal.Rptr. 744]; *Miller Family Home, Inc. v. Department of Social Services, supra,* 57 Cal.App.4th at p. 491.)

However, the trial court's statement of decision denying Gordon's petition for writ of mandate indicates the trial court did not rule on the abuse of discretion issue, and, presumably, Gordon did not submit this issue to the court for decision. Moreover, to the extent the trial court did rule on this issue sub silentio, the evidence clearly supports the court's implied finding that the sheriff did not abuse his discretion by imposing the restrictions at issue.

Finally, relying solely on *City and County of San Francisco v. Superior Court* (1981) 125 Cal.App.3d 879 [178 Cal.Rptr. 435], Gordon contends the restrictions on his peace officer powers are now invalid because those restrictions are based on conduct (the Pring incident) that occurred more than five years ago. The argument is nonsensical.

In *City and County of San Francisco v. Superior Court, supra,* the court reviewed the constitutionality of a provision that prohibits the disclosure of information regarding complaints about a peace officer where the complaint concerned conduct occurring more than five years before the event or transactions that is the subject of the current litigation. (125 Cal.App.3d at p. 881; Evid. Code § 1045.) While concluding that this provision was constitutional, Justice Elkington took notice of Penal Code section 832.5, subdivision (b), which states that complaints against peace officers and "any reports or findings relating thereto shall be retained for a period of at least five years." Justice Elkington then concluded Penal Code section 832.5 "will reasonably be construed as a legislative determination that such complaints will have lost all reasonable relevance to *any* public purpose, after a lapse of five years." (125 Cal.App.3d at p. 883, italics added.)

■ Deputy Gordon attempts to transform this questionable dicta into a substantive rule of law: namely, that discipline against a peace officer cannot remain in place for more than five years after the incident giving rise to the

discipline. There are so many reasons to reject this proposition it is difficult to prioritize them. Suffice it to say neither *City and County of San Francisco v. Superior Court, supra,* 125 Cal.App.3d 879, nor Penal Code section 832.5, supports this claimed rule of law. We therefore reject the argument.

### D. *We Must Reverse the Judgment on the Remaining Causes of Action.*

As indicated, the trial court first held a hearing on appellant's petition for writ of mandate and denied the writ. Subsequently, the respondents moved for judgment on the pleadings on the remaining five causes of action. The court granted the motion and entered judgment in favor of respondents on the remaining causes of action because its decision on the first cause of action for writ of mandate disposed of those causes of action under the doctrines of res judicata and collateral estoppel. Now that we have reversed the trial court's order disposing of the first cause of action, it follows that the judgment must be reversed in toto.

### III

### DISPOSITION

The judgment is reversed. The trial court is directed to enter an order granting Deputy Gordon's petition for writ of mandate to the extent it seeks a writ directing the San Mateo County Civil Service Commission to hold a hearing on Gordon's appeal of the restrictions contained in the sheriff's September 24, 1996 letter. The trial court may take any additional action that is consistent with the views expressed in this opinion.

Each party shall bear its own costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied February 13, 2001.